IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHNNIE FLOURNOY, #B61265, <br><br> Plaintiff, <br><br> v. <br><br> DEEDEE BROOKHART, LAURA CUNNINGHAM, MS. ELLIOT, WEXFORD HEALTH SOURCES, INC., and JOHN/JANE DOES, <br><br> Defendants. | Case No. 20-cv-01357-SPM |

# MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

Plaintiff Johnnie Flournoy an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Pinckneyville Correctional Center, brings this civil action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights. Flournoy claims that he has been provided inadequate treatment for his eye and throat conditions. He also asserts that proper COVID-19 protocols were not implemented at Lawrence Correctional Center, and as a result, he contracted the virus. He seeks monetary damages and declaratory relief.

The First Amended Complaint is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A. Under Section 1915A, any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or requests money damages from a defendant who by law is immune from such relief must be dismissed. *See* 28 U.S.C. § 1915A(b). At this juncture, the factual allegations of a pro se complaint are to be liberally construed. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009). The Court

must also consider whether any claims are improperly joined and subject to severance or dismissal. *See George v. Smith,* 507 F.3d 605, 607 (7th Cir. 2007).

## THE FIRST AMENDED COMPLAINT

In the First Amended Complaint, Flournoy alleges the that when he was housed Lawrence Correctional Center ("Lawrence") and currently at Pinckneyville Correctional Center ("Pinckneyville"), he has not received proper treatment for his glaucoma and throat condition. He also asserts that while at Lawrence proper COVID-19 protocols were not implemented, he did not receive medical treatment while he had COVID-19, and he was subjected to retaliation for filing complaints and grievances.

### *Glaucoma*

Flournoy suffers from glaucoma. (Doc. 10, p. 3). While at Stateville Correctional Center ("Stateville"), prior to being transferred to Lawrence Correctional Center, from 2007 through 2015, he underwent treatment and multiple surgeries on both eyes at the UIC Glaucoma Clinic in Chicago. Around 2008 or 2009, a glaucoma cataract formed. He again had surgery to remove the cataracts. He also had an artificial lens placed in both eyes. (*Id.*).

After all these treatments, Flournoy's condition continued to worsen as a result of not receiving timely refills of his prescriptions that would be delayed from months at a time. (Doc. 10, p. 3). His glaucoma became uncontrolled, and Flournoy underwent a fifth surgery in which he had a tube and plate inserted in both eyes. The doctor told Flournoy that anymore eye surgeries would result in blindness. (*Id.*).

Flournoy filed a legal action and numerous grievances and complaints about his eye care. In retaliation for complaining about his medical treatment, he was transferred to Lawrence Correctional Center. (Doc. 10, p. 4). At Lawrence, he continued to have issues with receiving refills for his glaucoma medicated drops. (*Id.*). He filed additional complaints, and in response, he

was taken to Effingham, Illinois, in August of 2018 to be seen by an eye doctor, Dr. Kay. (*Id.* at p. 4, 20).

At some point, Flournoy was examined by Dr. Brummer at Lawrence, who told him that "his vision was finished." (*Id.*). Dr. Brummer prescribed a magnifying glass to allow Flournoy to see words. Warden Brookhart and Health Care Administrator Cunningham blocked Flournoy from receiving a magnifying glass and, instead, gave him something called a magnifying sheet. The magnifying sheet does not work, and Flournoy cannot make out words when he uses the device.

In 2019, a new medical doctor, Dr. Pittman, began treating inmates at Lawrence. (Doc. 10, p. 4). Around this time, Flournoy no longer had any vision in his left eye, and he asked Dr. Pittman to place a request for him to transfer to Dixon Correctional Center so he could participate in the Braille Program. (*Id.*). Dr. Pittman stated that Flournoy should have never been transferred to Lawrence, since the doctors at UIC Glaucoma Clinic in Chicago had treated him for over nine years and were the only ones who know how to treat him after implanting the tubes and plates in his eyes during his last surgery. (*Id.* at p. 5). At another appointment, Dr. Pittman informed Flournoy that Brookhart and Cunningham were blocking any efforts she made to transfer him to Dixon for the Braille Program.

In July 2019, Flournoy had another appointment with Dr. Kay in Effingham, Illinois. (Doc. 10, p. 6). Dr. Kay told him that the tubes and plates in both eyes had moved, and now there were two "sacks" that needed to be removed. Dr. Kay scheduled surgery within 30 days. Upon his return to Lawrence, Flournoy had an appointment with Dr. Pittman. He told her what Dr. Kay had said about the movement of the tubes and plates necessitating surgery. Dr. Pittman reviewed the Medical Special Service Referral and Report, but the recommendation for a surgery had not been recorded. (*Id.*).

On August 13, 2019, Flournoy returned to the eye clinic. Dr. Kay said, "you know Black

people have a high rate of glaucoma, and you're the only one Black in here." (Doc. 10, p. 6). Dr. Kay had made a similar joke regarding Flournoy's race at the previous appointment, but Flournoy "felt he was just trying to be humorous." (*Id.*). He took Flournoy to another room and used a laser to remove a cataract in his right eye. Flournoy states that since his cataract surgery at UIC Glaucoma Clinic, he had not had any more cataracts. Following the procedure, he immediately lost clear vision, and now he cannot see words or make out a person's face from a short distance. (*Id.*).

In May 2021, Flournoy had a medical emergency and was taken to the health care unit. (Doc. 1, p. 9). He had problem with his left eye, causing his nervous system to be unbalanced. He experienced a strange heartbeat and sharp pains in his brain and left temple. The screening nurse did not take any vitals and sent him to see the eye doctor at the facility, Dr. Gentry. Dr. Gentry determined that Flournoy's left eye was badly infected and prescribed eye drops for Flournoy to use daily. (*Id.*).

A week passed, and the eye drop prescription had not been filled. (Doc. 10, p. 11). Flournoy filed an emergency grievance and was scheduled for an appointment with Dr. Gentry. Dr. Gentry did not mention the eye drops that Flournoy had still not received and prescribed him hydrocortisone cream to be placed in between the eyelid. Flournoy applied the cream as instructed until August 7, 2021. (*Id.*).

On July 29, 2021, Flournoy was transferred to Pinckneyville Correctional Center. (Doc. 10, p. 11). On July 30, 2021, he was issued three of the four glaucoma drops previously prescribed: brimonidine, dorzolamide, and latanoprost. He did not receive timolol. (*Id.*).

On August 7, 2021, Flournoy asked the other inmates on his wing to tell staff that he was having a medical emergency with his left eye. (Doc. 10, p. 10). The block officer took him to the health care unit. Flournoy took all of his eye medicine with him and showed the desk nurse. In

with the medicine was the hydrocortisone cream. The nurse told him, "Flournoy you can't put this in your eye, in fact, you can['t] put this any place near your eyes." The nurse phoned the doctor or medical director, who ordered that Flournoy be taken to an outside hospital. (*Id.*).

Flournoy was first taken to a hospital in Carbondale, Illinois. (Doc. 10, p. 10). The doctor stated that Flournoy should be taken to UIC Glaucoma Clinic in Chicago because that is where his treating doctor is located. A St. Louis doctor said that was too far, and this was an emergency. An ambulance was called, and Flournoy was taken to a hospital in St. Louis. Flournoy was examined and "worked on" for many hours. The doctors were deciding whether or not to do surgery or remove the entire eye. After close to 18 hours, the doctors decided to treat the issue with a strong antibiotic to bring down the infection, and then Flournoy would return to the hospital on the following Monday. (*Id.*). He was told that hydrocortisone cream had no use around the eyes. (*Id.* at p. 12). Flournoy was given eye drops to use every hour. He was then taken back to the Pinckneyville and placed in the health care unit. (*Id.*).

The following day, on August 8, 2021, the head nurse or nurse practitioner sat down with Flournoy and asked to see what cream the doctor at Lawrence had prescribed. She took the hydrocortisone cream and explained that the doctor had prescribed it to be used on the outside of the eyelid. She took the medicine and immediately left. (*Id.* at p. 12). The nurse had tricked Flournoy into turning over the evidence, but she did not know that Flournoy still had a refill of that prescription.

On August 9, 2021, Flournoy had an appointment with the eye doctor at Pinckneyville, who turned out to be Dr. Gentry, the same eye doctor who treated him at Lawrence. (Doc. 10, p. 12). Dr. Gentry stated that he was trying to reschedule an appointment with the St. Louis eye doctor, but that it was really the doctors at the UIC Glaucoma Clinic who should be treating Flournoy. Dr. Gentry gave Flournoy an eye pad to wear over his left eye. As of August 29, 2021,

Flournoy is experiencing the same problems and pains and has not received treatment or been taken back to the St. Louis hospital for a follow up examination. (*Id.*).

**Throat Condition**

Flournoy has a throat condition that makes it hard for him to swallow food and water and causes bouts of coughing and choking. (Doc. 10, p. 5). While at Stateville, he was diagnosed with acid reflux. At Lawrence, Dr. Pittman told him that his issues are caused by a flap in his throat that needs to be surgically removed. Dr. Pittman had him taken to a local hospital for an examination of his throat. At the appointment, he was told to return "so they could put [a] thing down his throat to determine how much of the flap needed to be removed." The medical providers at the hospital also directed Flournoy to be placed on a soft diet pending the surgery. Flournoy never received a soft food diet and did not return for the surgery. He continues to cough and choke. He is unable to swallow at times to the point where his blood pressure goes "sky high." (*Id.*).

On July 29, 2021, Flournoy was transferred to Pinckneyville Correctional Center without being taken back to the hospital for surgery to remove the flap, causing him ongoing issues with swallowing and breathing. (Doc. 10, p. 11).

**Blood Pressure/Hypertension**

In 2019 or 2020, Flournoy asked Dr. Pittman for a medical permit for a fan. (Doc. 1, p. 6). Because of the heat in the living area, his blood pressure and hypertension were always too high. Dr. Pittman granted the permit, but when Flournoy went to property, Office Hicks would not give him a fan. (*Id.* at p. 7). Hicks stated that he was not going to honor the permit, and he was going to speak to Warden Brookhart about Dr. Pittman. Hicks told Flournoy that he was putting the fan in storage, but Flournoy later learned that Hicks had destroyed the fan. (*Id.* at p. 7).

**COVID-19 Procedures**

Flournoy states that Dr. Pittman is a black woman and was the only doctor at Lawrence

who was trying to help the inmates with their medical problems. (Doc. 10, p. 4, 7). Brookhart, Cunningham, and other white employees "didn't like it and did things to thwart all her good efforts." Prior to Dr. Pittman leaving employment at Lawrence, she warned inmates that the corona virus was "gonna hit." Flournoy states that the "white racial staff [] in the Health Care Unit" ran her off and the virus hit us hard with no real precaution nor prevent[ion] taken." (*Id.* at p. 7).

Flournoy and other inmates were being warned on the news of "what not to do because of covid." (Doc. 10, p. 7). He and others filed emergency grievances to Brookhart about the "running of chow lines with hundreds of inmates in the chow hall, yard line, gym lines and even school program lines." Brookhart denied all the emergency grievances. The Placement Officer Supervisor, Elliot, recklessly started moving inmates housed on both the South and North side of the prison daily. Flournoy was housed in 5A, the ADA medical wing, in a single cell because of his vision impairment. (*Id.*). Elliot began moving Flournoy from one cell to another without reason. (*Id.* at p. 8). Flournoy believes that his multiple cell transfers were done in retaliation for filing grievances and complaints to the governor. (*Id.*).

Eventually, Elliott tried to move Flournoy to a cell with another inmate who did not wear a mask and who also had a bottom bunk permit. (Doc. 10, p. 8). Elliott tried to put Flournoy on the top buck, but "the block Sergeant didn't go for that." An hour later, Elliot, who was angry, moved Flournoy to another cell with a younger inmate who also did not believe in wearing a mask. (*Id.*).

In November 2020, Brookhart came to Flournoy's housing unit. (Doc. 10, p. 8). He complained to her about his cell, and she "hollered at him, saying No we're not playing musical chairs." The inmate worker who served food to the inmates in that unit and was in the neighboring cell, Papa Moe, told Brookhart that he was sick. Brookhart directed the officer to take him to the health care unit and further instructed the officer that if Papa Moe was not sick, then to write him

a ticket. Papa Moe died two days later from the corona virus. Papa Moe's cellmate also tested positive for COVID-19. Flournoy's cellmate became ill, and then he too became sick with COVID-19. Flournoy states that even though the staff was taking inmate temperatures, they were trying to cover up what they knew was going on in the facility. Flournoy filed a complaint and requested an investigation with the United States Department of Justice and the governor. (*Id.*).

After testing positive for COVID-19, Flournoy was moved to 6 House. (Doc. 10, p. 9). He was placed in a "handicap cell" by himself. He did not receive any medical treatment because Brookhart, Cunningham, and Wexford were enforcing a "cost cutting policy." Flournoy was released after 14 days and placed in 3 House. He still remained sick for several more days. He again filed a complaint with the governor and the United States Department of Justice.

### PRELIMINARY DISMISSAL

Flournoy lists all unknown and unnamed doctors, supervisors, and administrators as defendants, who he believes are employees of IDOC or Wexford. (Doc. 10, p. 2). While Flournoy may use a "John Doe" designation to refer to parties whose names are unknown, he must still follow Federal Rule of Civil Procedure 8 pleading standards and include a short, plain statement of the case against each individual defendant. He does not describe the unknown defendants or identify particular acts or omissions by any specific individual in the group who allegedly violated his constitutional rights. Thus, any claims brough against Unknown and Unnamed Doctors, Supervisors, and Administrators are dismissed without prejudice. *See also Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003) (finding dismissal of named defendant proper where plaintiff failed to allege defendant's personal involvement in the alleged wrongdoings); *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (finding the phrase "one or more of the Defendants" did not adequately connect specific defendants to illegal acts, and thus failed to adequately plead personal involvement).

The Court also dismisses claims against individuals who are named in the "Facts" section of the First Amended Complaint but not listed as Defendants.[1] The Court will not treat parties not listed in the caption as defendants. *See Myles v. United States*, 416 F.3d 551, 551–52 (7th Cir. 2005) (to be properly considered a party a defendant must be "specif[ied] in the caption").

## DISCUSSION

Based on the allegations of the First Amended Complaint, the Court finds it convenient to designate the following counts:

**Count 1:** Eighth Amendment claim against Brookhart, Cunningham, and Wexford for deliberate indifference to Flournoy's eye conditions, including his glaucoma.

**Count 2:** Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") claim against Brookhart and Cunningham for refusing to provide Flournoy a magnifying glass and refusing to transfer him to a facility with a Braille program.[2]

**Count 3:** First Amendment claim for housing Flournoy with other inmates in retaliation for filing grievances and complaints.

**Count 4:** Eighth Amendment claim against Brookhart, Cunningham, and Wexford for deliberate indifference to Flournoy's throat condition.

**Count 5:** State law medical negligence claim against Wexford.

**Count 6:** Eighth Amendment claim against Brookhart, Elliot, and Cunningham for failing to implement proper COVID-19 safety protocols.

**Count 7:** Eighth Amendment claim against Brookhart, Cunningham, and Wexford for failing to provide medical treatment to Flournoy once he contracted COVID-19.

**Count 8:** Fourteenth Amendment equal protection claim against Elliott, Brookhart, and Cunningham.

---

[1] This includes alleges regarding the refusal by Officer Hicks to honor Flournoy's medical permit for a fan. (Doc. 10, p. 7).

[2] Although Flournoy mentions only the ADA, "the [RA] is available to him, and courts are supposed to analyze a litigant's claims and not just the legal theories that he propounds, especially when he is litigating pro se." *Norfleet v. Walker*, 684 F.3d 688, 690 (7th Cir. 2012) (internal citations omitted).

**Count 9:** First Amendment claim against Elliott for moving Flournoy to different cells in retaliation for filing grievances and complaints.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the First Amended Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly*[3] pleading standard.**

*Severance*

Rule 20 of the Federal Rules of Civil Procedure prohibits a plaintiff from asserting unrelated claims against different defendants or sets of defendants in the same lawsuit. Under Rule 20, multiple defendants may not be joined in a single action unless the plaintiff asserts at least one claim to relief against each respondent that arises out of the same transaction or occurrence or series of transactions or occurrences and presents a question of law or fact common to all. *George*, 507 F.3d at 607 (emphasis added); 3A MOORE'S FEDERAL PRACTICE § 20.06, 2036–45 (2d ed. 1978).

Rule 18 allows a party to join unrelated claims against defendants in a lawsuit, but only after the requirements for joinder of parties have been satisfied under Rule 20. *Intercon Research Assn., Ltd. v. Dresser Ind., Inc.*, 696 F.2d 53, 57 (7th Cir. 1983) (citation omitted). Thus, the "core group" of allowable defendants must be determined under Rule 20 before a plaintiff may join additional unrelated claims against one or more of those defendants under Rule 18. There is no allowance, under either Rule 18 or Rule 20, for a party to join claims involving any defendant outside the "core group" identified under Rule 20.

In this case, Flournoy brings three groups of claims: (1) claims against Brookhart, Cunningham, and Wexford regarding lack of treatment and accommodations for his eye condition;

---

[3] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (7th Cir. 2007).

(2) claims against Brookhart, Cunningham, and Wexford regarding lack of treatment for his throat condition; and (3) claims against Brookhart, Cunningham, Elliott, and Wexford regarding the lack of procedures and care implemented in response to the COVID-19 virus. Flournoy's allegations suggest that the constitutional violations at issue are the result of decision-making that was influenced by a Wexford cost saving policy and are linked by the claim against Wexford. Thus, the claims may involve at least one common question of law or fact. The claims are not, however, transactionally related and should be severed. The COVID-19 policies and related treatment decisions are distinct occurrences under a unique set of facts. And while Rule 18 allows for the joinder of unrelated claims, this only applies after the parties have been properly joined under Rule 20. The COVID-19 claims involve not only Brookhart, Cunningham, and Wexford, but also Elliot, who is not a part of the "core group" of Defendants found in Counts 1-5.

Thus, the Court will exercise its discretion and sever Flournoy's claims regarding COVID-19, Counts 6-9, into a separate lawsuit. The new lawsuit will have a newly assigned case number and shall undergo preliminary review pursuant to Section 1915A, after the new case number and judge assignment have been made. The claims regarding lack of treatment and accommodation for Flournoy's on going medical issues, eye and throat conditions, will remain in this case, and the merits of those claims will be reviewed in this Order.

### *Merit Review of Counts 1-5*

#### Count 1

Flournoy claims that Warden Brookhart and Health Care Administrator Cunningham ignored his serious medical needs by failing to ensure that his medications were timely filled and the tubes and plates inserted in his eyes were monitored by a knowledgeable medical professional. He also states they are a part of a policy, pattern, and practice followed through the Illinois prison medical system and enforced by wardens and hospital administrators. (Doc. 10, p. 13-14).

To successfully state a claim for deliberate indifference to a serious medical need, a plaintiff must plead that his condition was "objectively, sufficiently serious" and that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)(citations and quotation marks omitted).

Here, the First Amended Complaint does not include factual allegations regarding Brookhart and Cunningham's personal involvement in the provision of medications, scheduling of appointments, or treatment decisions by medical providers. Neither does Flournoy allege that the medical providers and staff acted at the direction of Brookhart and Cunningham or with their knowledge regarding his medical treatment. Flournoy also does not specify the practice and policy that directed the conduct of Brookhart and Cunningham. It is not clear what actions they took that resulted in a knowing disregard of his medical conditions, *see Ortiz v. Webster,* 655 F. 3d 731, 734 (7th Cir. 2011), and Brookhart and Cunningham cannot be held liable under Section 1983 solely because of they held supervisory positions at Lawrence. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). For these reasons, Count 1 is dismissed without prejudice as to Brookhart and Cunningham.

Count 1 will proceed against Wexford. Flournoy claims that "because of a cost cutting policy and practice of Wexford" he has not received timely refills of his eye medications, he was not treated by knowledgeable medical professionals, and he has not been taken back to St. Louis hospital for follow up treatment of his left eye. (Doc. 10, p. 3, 11, 12).

**Count 2**

Flournoy alleges that Brookhart and Cunningham failed to "provide him ADA protections and accommodations." (Doc. 10, p. 14). Specifically, he claims they "blocked him from receiving a magnifying glass" that was prescribed to him by Dr. Brummer and "block[ed] any efforts he made to be transferred to Dixon for the Braille program." (*Id.* at p. 4-5).

These allegations are sufficient to state and ADA and RA claim. However, this claim cannot proceed against any individual defendants because individual employees of IDOC cannot be sued under the ADA or the RA. *See Jaros v. Illinois Dep't of Cor*r., 684 F.3d 667, 670 (7th Cir. 2012). Instead, the proper defendant is the relevant state department or agency. *See* 42 U.S.C. § 12131(1)(b). *See also Jaros*, 684 F.3d at 670, n.2 (indicating that individual capacity claims are not available; the proper defendant is the agency or its director (in his official capacity)). Therefore, the Court will add IDOC as a defendant, and Count 2 will proceed only against IDOC. Count 2 is dismissed with prejudice as to Brookhart and Cunningham.

### Count 3

Flournoy claims that prior to 2019, at Lawrence, he was housed in a medical wing for ADA inmates in a cell by himself. (Doc. 10, p. 4). He then began filing complaints with the governor and submitting grievances, and as a result "they started putting some of the worse inmates in the cell with me." He notified Brookhart and Cunningham, but they ignored him.

Prison officials may not retaliate against inmates for filing grievances, exercising First Amendment rights, or otherwise complaining about their conditions of confinement. *See, e.g., Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012). To state a retaliation claim, a plaintiff must allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014).

Here, it is not clear who Flournoy is claiming retaliated against him. He says "they" started housing him with other inmates, after he filed grievances and complaints, but he does not state who "they" are. He reported his cell situation to Brookman and Cunningham, and they ignored him. But there are no allegations to suggest that Brookman and Cunningham acted in retaliation

by failing to rectify the celling situation. Because the retaliation claim is not asserted against a named defendant, Count 3 is dismissed without prejudice.

### Count 4

Flournoy claims that after he visited an outside hospital regarding his difficulties swallowing food and liquids and ongoing cough and choking, it was recommended that he be placed on a soft food diet and have surgery. (Doc. 10, p. 5). He has not received any further treatment and continues to have difficulties swallowing and breathing. (*Id.* at p. 5, 11). Flournoy claims that Brookman and Cunningham failed to ensure that he was scheduled for surgery. (*Id.* at p. 14).

As previously discussed, this is not sufficient to state an Eighth Amendment claim. It is not alleged that Brookman and Cunningham had any involvement in Flournoy's treatment or had knowledge that Flournoy needed further scheduling. They cannot be held liable under Section 1983 on the basis of *respondeat superior*, their role as supervisors. Accordingly, Count 4 is dismissed without prejudice as to Brookhart and Cunningham.

Count 4 will proceed against Wexford for impeding Flournoy's ability to receive the surgery in a continual effort to cut costs. (Doc. 10, p. 11).

### Count 5

Flournoy brings a state law medical negligence claim against Wexford. Where a district court has original jurisdiction over a civil action such as a Section 1983 claim, it also has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a), so long as the state claims "derive from a common nucleus of operative fact" with the original federal claims. *Wisc. v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008). Flournoy's allegations of medical negligence derive from the same facts as his Eighth Amendment deliberate indifference claims in Counts 1 and 4, so the Court will exercise supplemental jurisdiction over the claim.

Flournoy alleges that unknown doctors employed by Wexford, as well as Wexford, breached their duty to apply the proper standards of medical care om treating his eye and throat conditions, resulting in physical injury and pain and suffering. This is sufficient for Count 5 to proceed against Wexford.

Although Flournoy is allowed to proceed with Count 5 at this point in the case, the Court notes that he has not provided the affidavit and medical report required under Illinois state law, 735 ILCS § 5/2-622. If he intends to proceed with this claim, Flournoy must file an affidavit stating that "there is a reasonable and meritorious cause" for litigation of the medical malpractice claim, along with a physician's report in support of the affidavit. *See Young v. United States*, 942 F.3d 349 (7th Cir. 2019). Flournoy is advised that he must comply with the requirements set forth in 735 ILCS § 5/2-622 before the summary judgment phase of the case. *Id.*

## DISPOSITION

For the reasons stated above, the claims against Defendants Unknown and Unnamed Doctors, Supervisors, and Administrators are **DISMISSED without prejudice**. The Clerk shall **TERMINATE** them as defendants.

**COUNTS 6, 7, 8,** and **9** are **SEVERED** into a new lawsuit against **Brookhart, Cunningham, Elliott,** and **Wexford Health Sources, Inc.** In the new case, the Clerk shall file the following:

1) The First Amended Complaint; and
2) This Memorandum and Order.

The only claims remaining in this action are **COUNTS 1-5** against **Brookhart, Cunningham,** and **Wexford Health Sources, Inc.** The Clerk of the Court is **DIRECTED** to terminate **Elliott** as a defendant in this action.

The First Amended Complaint survives preliminary review pursuant to Section 1915A.

The Clerk of Court is **DIRECTED** to **ADD** the Illinois Department of Corrections ("IDOC") as a defendant. **COUNT 1** will proceed against **Wexford** but is **DISMISSED** without prejudice as to **Brookhart** and **Cunningham**. **COUNT 2** will proceed against **IDOC** but is **DISMISSED** with prejudice as to **Brookhart** and **Cunningham**. **COUNT 3** is **DISMISSED** without prejudice. **COUNT 4** will proceed against **Wexford** but is **DISMISSED** without prejudice as to **Brookhart** and **Cunningham**. **COUNT 5** will proceed against **Wexford**. Because there are no surviving claims against **Brookhart** and **Cunningham,** they are **DISMISSED** without prejudice. The Clerk is **DIRECTED** to terminate them as defendants.

Because Flournoy's claims involve medical conditions, the Clerk of Court is **DIRECTED** to **ENTER** the standard qualified protective order pursuant to the Health Insurance Portability and Accountability Act.

The Clerk of Court shall prepare for **Wexford** and the **Illinois Department of Corrections** the following: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is directed to mail these forms, a copy of the First Amended Complaint, and this Memorandum and Order to the defendants' place of employment. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require the defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by Flournoy, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, his last known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to file an appropriate responsive pleading to the First Amended Complaint in a timely manner and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, Defendants only need to respond to the issues stated in this Merit Review Order.**

Finally, Flournoy is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than 7 days after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: January 11, 2022**

                                             *Stephen P. McGlynn*
                                             **STEPHEN P. MCGLYNN**
                                             **United States District Judge**

**NOTICE TO PLAINTIFF**

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take **90 days** or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.